IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION
CIVIL ACTION NO. _____

|  |  |
|---|---|
| KIMBERLY CARSON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF WILMINGTON,<br><br>Defendant | **COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiff, by and through counsel, complaining of the Defendant, alleges and says:

## NATURE OF THE CASE

1.    This is an action by the Plaintiff, Kimberly Carson, (herein "Carson"), an African American female and former Director of Diversity, Equity, and Inclusion with the City of Wilmington, against her former employer, the Defendant City of Wilmington (herein the "City"), for racial discrimination, hostile work environment, retaliation, disparate impact, and constitutional violations (both State and Federal), for the repeated acts of retaliation, discrimination and adverse employment actions by Tony Caudle (herein "Caudle", the former City Manager), Meredith Everhart (herein "Everhart", the City Attorney), Mary Vigue (herein "Vigue", the Assistant City Manager), Clayton Roberts (herein "Roberts", the HR Director), Adam Hall (herein "Hall", the HR: Talent and Development Manager), and Kim Sampson (herein "Sampson", the HR: Assistant Director) (collectively "the responsible City employees"), and the associated disparate impact upon African Americans, arising from Carson's employment and termination thereof of that employment for having retaliated against Carson during her employment after she learned of the policy and practice of the City to undertake investigations of African American

employees of the City, at great expense to taxpayers (and then provide false information about what was spent and on who/what), or to otherwise treat African American officers of WPD differently than other officers who were not; and after she learned (and was apparently expected to keep secret) that Vigue, her white direct supervisor and the Assistant City Manager (and upon information and belief, the "source" of the alleged grievances against Carson that led to the "investigation" that led to her termination), has a significant substance abuse issue or otherwise suffers from issues that prevent her from doing her job, had been visibly impaired while working, and although other responsible white City employees were fully aware of Vigue's issues and had in fact complained to Carson about them, they each made a conscious decision to do nothing about it.

2.      Carson's discovery of her dysfunctional direct white supervisor was closely followed by her discovery of the misuse of City funds through the City's retention, through responsible City employees, of a wholly unqualified and completely conflicted outside company to undertake an alleged "investigation" of the City's then Chief of Police, Donnie Williams (the City's first African American Chief of Police), and then to make knowingly false statements to the public about the City funds that were expended for that investigation.

3.      After Carson made the obvious bias and conflicts inherent in any alleged "investigation" of Chief Williams clear to responsible white City employees, she learned that notwithstanding the public statements made by responsible City employees about the funds that were expended for the alleged "investigation" of Chief Williams, this same wholly unqualified outside company was retained to undertake an investigation of another long term African American female employee of the City.

4. Carson's job led to her being provided further information that appeared to make clear to her that there existed a culture of racial bias within the Wilmington Police Department ("WPD") against African American officers by others within the WPD that were not. Thus, shortly after her employment began, Carson learned what the white responsible City employees wanted no one to know – that African American employees of the City, including those in positions of leadership, were going to be treated differently, and there was nothing that anyone would do to stop it.

5. Instead of doing anything to remedy the almost daily issues associated with the issues of impairment with Vigue; the lack of any direction and supervision by Vigue of Carson; rectify the misuse of public funds; or address the issues of racial bias within the WPD and (as Carson would learn) elsewhere within the City of Wilmington, Carson instead faced retaliation directly from responsible white City employees, including a "star-chamber" like meeting where responsible white City employees harassed and intimidated her to the point that Carson felt threatened and needed to leave. After Carson voiced her adamant disapproval of the manner in which she was treated, this "star chamber" was followed by an "investigation" of Carson that responsible white City employees informed her that they were conducting by reason of "unspecified" allegations by "unnamed" City employees (that Carson later learned emanated from her impaired white supervisor, Vigue), using a procedure that is nowhere to be found within any policies or procedures of the City.

6. Carson's dismissal came after she raised concerns about the procedures that had been used in any "investigation" of her and after she filed a grievance against Tony Caudle (then City Manager), Meredith Everhart (City Attorney), Mary Vigue (Assistant City Manager), Clayton Roberts (HR Director), Adam Hall (HR: Talent and Development Manager), and Kim Sampson

(HR: Assistant Director) for failure to uphold the City's stated core values and ethical and legal standards, leading to a hostile work environment, retaliation, discrimination, and severe breaches of workplace integrity. Instead of acting upon Carson's grievance, the City instead chose to terminate her, citing as a pretext the results of the "investigation' that it had conducted.

7. The conscious and willful violations of Carson's protected rights by the City, during her tenure as the Director of Diversity, Equity, and Inclusion for the City officially began on May 20, 2024, and continued until her unlawful termination on May 8, 2025.

8. Carson made heroic efforts to avoid this litigation and, as a single mother, keep her job. But the desire on the part of responsible City employees to bury the truth and to attempt to stigmatize and discriminate against yet another African American employee of the City (Carson) mandates that she file this action to hold the City accountable, for which she seeks compensatory damages and her attorneys' fees.

9. This case is not about Carson's personality; it's not about her tone; it's about her race, and the fact that she is a strong-willed leader who is also black. This case is about whether the City may selectively investigate and/or discipline African American employees of the City; whether racial stereotypes may justify an investigation and termination; whether Carson, as DEI Director, can be punished for identifying discrimination and the visual impairment of her white supervisor; and whether City leaders may weaponize internal investigations to silence dissent and hide racism.

10. The City's actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq,,* the Equal Protection Clause of the Fourteenth Amendment (through 42 U.S.C. §1983), and Article I, §§1 and 19 of the North Carolina Constitution.

**PARTIES**

11. Plaintiff Kimberly Carson (hereinafter "Plaintiff" or "Carson") is a citizen and resident of Brunswick County, North Carolina.

12. Defendant, The City of Wilmington (hereinafter, "City," "the City of Wilmington," or "Defendant") is a body politic and corporate, organized and existing under the laws of the State of North Carolina, capable of suing and being sued, and having, upon information and belief, no immunity to Plaintiff's claims, and otherwise having waived any immunity to Plaintiff's claims by the purchase of a policy of liability insurance. The City is a municipal employer within the meaning of Title VII and employs more than fifteen (15) employees.

13. At all times relevant to this action, the City acted under color of state law.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over all the parties and matters in controversy herein. 28 U.S.C. §§1331 and 1343; 28 U.S.C. §1367.

15. Venue is proper pursuant to 28 U.S.C. §1391.

16. Carson timely filed a Charge of Discrimination with the EEOC and received a Notice of Right to Sue. This action is filed within ninety (90) days of receipt.

**FACTUAL ALLEGATIONS**

17. The City of Wilmington has nearly 1,100 employees across nineteen (19) departments.

18. At all times material to this action, the City of Wilmington was governed by a non-partisan City Council, consisting of Mayor Bill Saffo, Mayor Pro-Tem Rev. Dr. Clifford Barnett, and five (5) City Council Members. All council members, including the mayor, are elected at large. The mayor serves a two-year term, while council members serve staggered four-year terms. The

**SHIPMAN WRIGHT & MOORE, L.L.P.**
575 Military Cutoff Road– Wilmington, N.C. 28405

City Manager, appointed by the council, is responsible for implementing Council policies and overseeing City operations.

19.     City employees, upon hire or promotion, are provided with a copy of the City of Wilmington Employee Handbook (hereinafter "Employee Handbook"). Contained within the Employee Handbook is information about job classification, salary administration, and paid leave administration. It also provides important information on the City's commitment to diversity, equity, inclusion, and the City's policies on workplace conduct, work schedules, safety on the job, and obligations of city employees.

20.     On August 18, 2020, City Council unanimously voted to adopt the "Rise Together" Initiative to improve understanding, equity, and civic inclusion for all neighbors and to ensure that Wilmington is a community where every citizen is valued and shares in the same opportunities for prosperity and quality of life regardless of color, class, or creed.

21.     In January 2022, the City's Office of Equity & Inclusion was created in response to the City Council's unanimous commitment to its Rise Together Initiative, with the purpose of fostering an equitable and inclusive workplace combined with cultivating a culture and community where employees and residents are appreciated, esteemed, and acknowledged for their unique identities.

22.     The City's Office of Equity & Inclusion is dedicated to promoting the principles of fairness, equal opportunity, and inclusiveness in employment, housing, and public accommodations. To achieve this goal, the department endeavors to create, facilitate, promote, study, and recommend programs, projects, feedback, and actions aimed at eradicating discrimination in municipal services, programs, and all other aspects of human interaction.

23. The City created the position of Director of Diversity, Equity, and Inclusion ("DEI") to lead the new department. The position involves providing guidance and direction to City staff on integrating equity and inclusion principles into all operations, projects, and services of the City. Additionally, the position requires providing recommendations to the City Council, City Manager, Department Leadership team, and staff regarding diversity, equity, and inclusion principles and methods to create a more inclusive workplace for all. The position was to serve as part of the City's Executive Management Team and to serve as subject matter expert on issues of diversity, equity, and inclusion.

**HIRING OF CARSON**

24. The City's first Director of Diversity, Equity, and Inclusion ("DEI") was Joe Conway. Mr. Conway was hired in January 2022 and resigned from the position in December 2024. Upon Mr. Conway's resignation, the City of Wilmington launched a nationwide search for its next Director of DEI.

25. Carson, a single mother, was heavily recruited by the City from her job in Burlington, Vermont, where she led that city's equity and inclusion strategies since 2022. Prior to that, Carson worked for the Iowa Judicial Branch for eleven (11) years in a variety of roles, including talent management and development, leadership development as a Juvenile Court Officer and the Director of Education and Human Capital Development.

26. Carson received her BA in Interdisciplinary Studies and Minors in English, History, and Sociology from Louisiana State University in 1998. Carson obtained her degree while competing as a Division I Athlete, where she was a two-time NCAA Individual National Champion in the 55 and 100-meter hurdles, a seven (7) time Team NCAA National Championship

member and a seven (7) time All-American. Carson also received her DEI certification from Cornell University in 2021.

27.     Carson's career has centered on public service, high ethical responsibility, and ensuring procedural fairness for both internal and external partners. While working in Iowa, Carson was the highest ranking African American woman in Iowa state government.

28.     The City offered Carson the position of Director of DEI, and the City knew that to accept that position, Carson would be required to give up a stable job that she held in Burlington, Vermont, and the promise of continued employment there to relocate with her children to Wilmington, at great cost, expense and burden to Carson.

29.     However, at the time that Carson accepted the position of Director of DEI with the City, she simply did not know that there existed a culture among the responsible white City employees to promote and/or condone the differential treatment afforded to African American employees of the City vs. employees who weren't.

30.     At all times relevant to this action, African American employees were underrepresented in leadership positions within City government.

31.     Carson accepted the position of Director of DEI for the City, and pursuant to the City's facially neutral policies, was placed on a 12-month probationary period.

32.     At the time that Carson accepted the position of Director of DEI with the City, she did not know that the responsible white City employees were not committed to "Rise Together", but were committed to see if they could use Carson, an African American single mother, as a symbol of something to which they were not committed – diversity and inclusion – and believed that Carson, a single mother moving from another State, would never push back against the status quo if she learned the truth.  They were wrong.

33. Carson's employment began with a mixture of in-person and remote work, as her son was still in school in Vermont, and Carson needed to secure housing in North Carolina.

34. Carson's first "in person" day with the City was May 20, 2024, when she attended a lunch with the executive team, with the exception of Vigue, who was to have been Carson's direct supervisor.

35. Upon information and belief, the City has a "Manager's Checklist" for onboarding new hires and transfers, and the responsibility for doing that with Carson was on Vigue. In the first week of employment, a new hire is supposed to receive "New Employee Orientation", which is a full-day session, during which Human Resources is supposed to collect all required paperwork, conduct policy sign-off's and compliance training, issue the new hire's badge, and discuss pay, benefits, policies, as well as set-up network access.

36. Carson received only the general "New Employee Orientation." There was no training specific to her supervision and/or executive leadership role.

37. Also, in the first week of employment, upon information and belief, new City employees are supposed to be a part of what is known as "Meet & Greet", wherein they receive a tour of the facility (bathrooms, break rooms, entrance/exits, time-clock, printer, etc.), distribution of any necessary equipment (PPE, cell phone, vehicle keys, office keys), and are supposed to receive introductions (provide a list of important numbers or key contacts and introduction to the team).

38. Carson never received a "Meet & Greet."

39. In their first week of employment, upon information and belief, new City employees are also supposed to receive a "Department Culture Review" which includes information on work schedule and hours of work; call-out procedures/overtime/vacation requests;

uniform/dress code; parking; lunch break and times; timesheet process; safety and security information; and other "need to know" items.

40.     Carson never received the "Department Culture Review".

41.     Upon information and belief, new City employees are also supposed to receive "Review Performance Expectations" with their supervisors  (in this case Vigue) within their first week of employment, wherein new City employees receive a review of the job description, expectations of performance, review of NeoGov Perform (goals, approving evaluations, making entries), scheduling of follow-up meetings (30, 60 and 90 days out), discuss the assignment of co-workers to rotate with the new team member for training, and discuss touring City facilities or doing site visits.

42.     Carson never received the "Review Performance Expectations" from Vigue, in her first week of employment, or for that matter, during her entire tenure with the City.

43.     Vigue scheduled an "onboarding meeting" with Carson on May 21, 2024, and cancelled it, and Vigue did not meet with Carson until May 28, 2024, when a remote meeting took place that was supposed to be 1:1 with between Carson and Vigue, but included Amy Schlag (hereinafter Schlag), the Equity and Inclusion Specialist employed by the City of Wilmington.

### THE "INVESTIGATION" OF DONNIE WILLIAMS, THE CITY'S FIRST AFRICAN AMERICAN POLICE CHIEF AND ANOTHER HIGH RANKING AFRICAN AMERICAN CITY EMPLOYEE

44.     Donnie Williams grew up in public housing (Creekwood) in the City, a city that has a historically checkered past with respect to racism and racial tension (1898 race riots, the Wilmington 10).  Donnie Williams got his start with the Wilmington Police Department ("WPD") as a Summer Youth Worker assigned to the Office of the Chief and served as a police cadet before becoming a sworn officer in 1992.

45.     During his time with the agency, Donnie Williams proudly rose through the ranks as a dedicated and passionate servant of the community and the City of Wilmington.

46.     On January 21, 2020, Donnie Williams was unanimously approved to be Interim Chief of the WPD by the City Council and stepped into that role on February 2, 2020.

47.     After a nationwide search, Interim Chief Williams was officially sworn in as Police Chief on June 23, 2020, becoming the City's first black chief of police.

48.     On June 24, 2020, the day after Chief Williams was sworn in, he announced the firing of three veteran white officers, following video footage that was recovered from an officer's cruiser which revealed the three officers "venting" about African American people and criticizing Chief Williams, who is also African American.

49.     In a conversation between two of the white officers, both officers referred to African American people multiple times as the "n-word". One white officer used the "n-word" to describe a woman he just arrested and said, "she needed a bullet in her head right then".  Another white officer also referred to a magistrate, who is African American, as a "negro magistrate." Later in the conversation, a white officer said he's "ready" for a civil war, using the "n-word", that "we are just gonna [sic] go out and start slaughtering them." A white officer then stated, "God, I can't wait."

50.     The firing of the three white officers for their racist comments caught on tape made local and national news amid a nationwide reckoning over race and policing following the deaths of George Floyd in Minneapolis, Minnesota, Breonna Taylor in Louisville, Kentucky, and Rayshard Brooks in Atlanta, Georgia.

51.     Chief Williams was quoted in a CNN article stating, "This is the most exceptional and difficult case I have encountered in my career. We must establish new reforms for policing here at home and throughout the country."

52.     Chief Williams sought to turn a fractured agency into one with set rules and guidelines that promoted equality and opportunity for all officers, regardless of race.

53.     Inevitably, with change came pushback, which is exactly what Chief Williams experienced.

54.     Williams' actions in the termination of these racist officers did not sit well within WPD, that because of its "quasi-milataristic" structure, had other "veteran" officers within WPD that, upon information and belief, harbored similar views to those of the terminated racist officers.

55.     Continuing a practice that existed before Williams became Chief, promotion opportunities within WPD included community involvement via a "board" of members of the community who would interview prospective candidates for promotion and provide a "non-binding" recommendation to the ultimate decision makers.  That process resulted in a significant percentage of promotion opportunities being awarded to African American candidates, and that process did not sit well with non-African American members of the WPD

56.     Officers within WPD who were not African-American commenced a campaign that was designed to discredit their African American Chief.  Upon information and belief, during an "exit interview" with a retiring white member of the WPD, complaints were made against Chief Williams, and upon information and belief, without ever confronting Chief Williams with any of these complaints, a decision was made by one or more of the responsible white City employees to have a "formal" investigation undertaken of the complaints of only a few non-African American WPD officers against Chief Williams.

57.     Upon information and belief, one of the main sources of these complaints was from Deputy Chief Alejandra Sotelo (hereinafter Sotelo), who is not African American.

58.     Upon information and belief, in May of 2024, upon the recommendation of Everhart, the City hired US ISS Agency, LLC (hereinafter ISS), purportedly to conduct an "independent" investigation of certain issues within WPD, including Chief Williams.

59.     ISS is a firm located in Huntersville, NC, and upon information and belief, Deputy Chief Sotelo's husband was formerly employed by and was friends with the owner of ISS.  Based on that conflict alone, ISS should never have been involved with any investigation involving the WPD generally and any allegations from Sotelo specifically.

60.     Before Everhart assumed her role as City Attorney, Everhart served as the attorney for the WPD and knew Sotelo and her animus towards Chief Williams and knew that Sotlelo's husband was formerly employed by the owner of ISS. Upon information and belief, although Everhart knew, or reasonably should have known, that Sotelo (who is not African American) harbored grievance against Chief Williams, Everhart never revealed her knowledge of the conflict that ISS would have in undertaking an investigation of Chief Williams.

61.     After a completely worthless "investigation" spanning approximately four (4) months, ISS issued a report on August 3, 2024 (hereinafter "ISS Report").

62.     During the "investigation", only a few officers of the WPD were interviewed, and none of the fifteen (15) individuals that Chief Williams identified as having information relevant to any "investigation" were interviewed, including Caudle, his supervisor.

63.     Between August 2024 and November 2024, those non-African American WPD officers that had precipitated this jaundiced "investigation" pressed the City to release the ISS Report.  Williams opposed the release of the ISS Report, although he never reviewed it, knowing

that the "investigation" was not impartial and was conducted in an effort to appease those within the WPD that harbored animus towards him because of his race.

64. In November 2024, in her role as Director of DEI, Carson was asked to review the ISS Report.

65. One of the first things Carson discovered upon her review of the ISS Report was the biased relationship between those conducting the investigation and some of those who made the allegations leading to the investigation, leading Carson to immediately conclude that there was nothing "independent" about this alleged "investigation."

66. This bias became further evident to Carson when she learned that none of the fifteen (15) people that Chief Williams had requested be interviewed had been interviewed, and no justifiable reason was given for the failure to do that.

67. The bias of the investigation became further evident to Carson by the manner in which it was written, reading not like an investigation at all, but like an indictment of Chief Williams, shockingly one-sided, and full of conclusions that were not otherwise justified by the "facts" revealed therein.

68. After the bias of the investigation became evident to Carson, she realized that Everhart knew, or reasonably should have known, of the bias of those conducting any investigation.

69. Carson concluded from her review of this report that it was not reliable; was not impartial; was not conducted as an independent investigation should have been conducted; did not and could not justify any disciplinary action against Chief Williams; and most certainly constituted a gross waste of public funds, sentiments that she revealed to responsible City employees.

70. Upon information and belief, the City (through Caudle and/or Everhart) also requested that ISS undertake a separate investigation into allegations by unnamed City employees against another high-ranking long term African American female City employee.

71. Like Carson, the individual that was the subject of this separate investigation is a strong African American woman who performs her job at a high level and in a fashion that (apparently) some white employees of the City found offensive. But as with Chief Williams, Carson knew that there was nothing that would have justified expending taxpayer money to undertake an investigation of this individual.

72. Upon information and belief, ISS had no experience undertaking "personnel" investigations of the type it was asked to conduct regarding the other long-term African American female City employee, nor was any such investigation (and the associated expenditure of public funds) warranted based upon any allegations against this employee as Carson understood them to be.

73. When the public and the press requested that the City reveal how much money was spent on the alleged "investigation" of Chief Williams, Everhart responded that the City had expended the sum of $75,000.00 for that investigation, something that Everhart knew was a lie, and that Carson learned was a lie.

74. In reality, the completely biased and conflicted "investigation" into Chief Williams cost taxpayers $50,000.00 and the subsequent investigation into the high profile African American female employed by the City cost taxpayers $25,000.00, a total of $75,000.00 of wasted public resources.

75. Carson shared all of her concerns about the biased and conflicted "investigation" into Chief Williams with Caudle, who simply chose to do nothing about it.

76. Therefore, in her review of the ISS Report and other information that Carson continued to accumulate in her role as Director of DEI, Carson was in possession of information that affirmatively showed Everhart made deliberately false statements to the media; that the City had wasted public monies on a completely biased and conflicted "investigation" of its African American police chief and a separate investigation into another high-ranking African American female City employee; and that the responsible City employees were not committed to attracting, employing and maintaining qualified African American employees   Carson's knowledge of the misuse of public funds, coupled with her knowledge of a dysfunctional leadership staff within the City that continued to condone the differential treatment of African American of City employees versus their white counterparts, spelled the beginning of the end of her employment with the City.

## AN IMPAIRED ASSISTANT CITY MANAGER AND SYSTEMIC RACISM

77. By November 2024, Carson was witnessing what she believed to be systemic racism within the ranks of employment in City government, bolstered by the efforts of non-African American City employees, including the responsible white City employees, to ignore it and in the process to discredit and/or get rid of high-ranking African American members serving the City.

78. By November 2024, Carson could tell that her white counterparts in positions of leadership in the City were treating her differently, and that white employees of the City with whom she interacted did not respect the views of a highly qualified and intelligent African American woman whose job it was to promote diversity and inclusion, and were in fact offended by her efforts.

79. By November 2024 Carson already knew that African American employees were underrepresented in leadership positions within the City and that the targeted investigations of the few high-ranking African American employees (versus white or non-African American

employees) that did exist did not represent a commitment by the City to its stated "Rise Together Initiative" that created the office that Carson held.

80.     By November 2024, Carson knew that the City, through the responsible City employees, were not committed to "fostering an equitable and inclusive workplace" or "cultivating a culture and community where employees and residents are appreciated, esteemed, and acknowledged for their unique identities."

81.     By November 2024, Carson had been, in her position with the City and in her prior positions, a fierce advocate for all of these things, a reason why she believed that as a strong-willed African American woman she was hired by the City.

82.     By November 2024, Carson witnessed first-hand the willingness of responsible white City employees to perpetuate the stereotypes regarding African American women that centered around the "angry Black woman" trope, one in which African American women are painted as hostile, aggressive, overbearing and ill-tempered, penalizing them for exhibiting leadership traits. These stereotypes dominated the "investigation" of Carson (see below) and formed the basis for the action taken to terminate her employment with the City.

83.     But by November 2024, Carson knew that the mostly white leadership within the ranks of City government with whom she worked, including the responsible City employees and in the case of Vigue, the individual to whom she was to report, were an incredibly dysfunctional group, led by Caudle, a white long time municipal/government employee named as City Manager to replace the City's long-time African American City Manager, who everyone in the City knew was on his pathway to retirement and Vigue, who as Deputy City Manager by November 2024 had been arrested during daylight hours on a weekday for DWI shortly after her employment with the City and had exhibited behaviors indicative of an ongoing issue with substance abuse, even while

working. Upon information and belief, Vigue's DWI came the day after she passed out and was found by another City employee in some bushes, and the day Vigue was arrested, she was bailed out by the City's Budget Director.

84. By November 2024, Carson knew the "dirty little secrets" about the dysfunctional nature of leadership in the City, and that its Deputy City Manager had significant substance abuse issues, and that the responsible City employees fully expected that she hide those "dirty little secrets."

85. By November 2024, Vigue had provided little oversight of Carson and showed little interest in what Carson was doing or attempting to do, and Carson most certainly never heard from Vigue that there were any issues with how Carson was performing her work.

86. By December 2024, Carson had participated in meetings and conversations with Vigue, also participated in by others, including responsible City employees, when Vigue was noticeably impaired, her speech was slurred and she would "nod off" during these meetings.

87. After these meetings and conversations, others who participated would share their concerns about Vigue with Carson, who obviously was not in any position to do anything about it. However, after months of efforts on Carson's part to have Vigue interact with her about what Carson was supposed to be doing, and Carson requesting support and intervention from others who simply told Carson to "ride it out" since they felt they could do nothing, in December 2024, Carson reported her concerns to Caudle, the City Manager.

88. As Caudle had done with what he knew to be the misuse of City funds for the payment of a bogus "investigation" of the Chief of Police and another African American City employee, the subsequent false public statements made about that, and the brewing racial issues within the WPD, Caudle chose to do nothing, notwithstanding the fact that by December 2024,

Caudle (who had known Vigue while she was employed by the City of Raleigh) knew, or reasonably should have known that Vigue was not only not doing her job as Carson's supervisor, but appeared to have significant substance abuse issues.

89. After Carson's discussions with Caudle regarding Vigue, on December 19, 2024, while serving as the Acting City Manager (Caudle being out of Town), Vigue attended an event, attended by other City employees, at C-Suite Lounge in downtown Wilmington and was observed, by Carson and others, to be severely intoxicated.

90. Carson inquired of HR Director Clayton Roberts if he was going to take Vigue home, to which Roberts replied that, "if she wanted to drive, let her; she's an adult". Carson left the event after a short period, but upon information and belief, Vigue left the event in her vehicle and drove home notwithstanding her intoxicated condition, and the other City employees who were present and knew of her condition, allowed her to do so.

91. The next day, December 20, 2024, Vigue neither showed up for work nor sent a message to the staff that she would not be working.

92. On December 30, 2024, Vigue conducted a check-in with Carson during which Vigue noted, "[s]ince joining the city, Kim has done a great job embracing the city's core values. She has worked and reached out to departments across the organization, and she has been available to participate in special projects and teams. She communicates well and holds herself and others accountable." Prior to her dismissal, this was the only "evaluation" that Vigue ever provided to Carson. But approximately one (1) month later, Carson became the subject of an "investigation" purportedly initiated, upon information and belief, by Vigue.

93. In her role as Director of DEI, Carson was asked by Caudle to review information that he provided to her that caused Carson to conclude that white officers in the internal affairs

division of the WPD had conducted interviews of African American WPD officers in a manner that differed in material respects from the manner in which similarly situated white officers of WPD were interviewed, and the actions of those African American WPD officers were scrutinized in a fashion different than those of white WPD officers.

94. This information confirmed to Carson what she already believed – that there existed a culture of systemic racism within WPD, and that African American WPD officers were in fact treated differently than those that were not. Carson shared her conclusions with Caudle, and again, Caudle chose to do nothing.

## RACE-BASED STEROTYPING AND HOSTILITY

95. On January 10, 2025, Carson was summoned to a meeting, the subject of which was "DE&I Role in Employment Matters", attended by Everhart, who was not Carson's supervisor. Upon information and belief, this meeting was precipitated by Caudle's request to Carson that she review the differential treatment of African American police officers in WPD.

96. Everhart's attitude and demeanor towards Carson was noticeably hostile, and Carson raised concerns about her bullying and harassing behaviors displayed by Everhart, witnessed by Clayton Roberts (HR Director), Vigue and Sean Evans (Deputy City Attorney), all of whom were present. Carson made clear that due to the behavior of those named individuals, she was being placed in a psychologically unsafe work environment.

97. During the January 10, 2025, meeting, Carson was interrogated and belittled, despite communicating to the group several times that she felt unsafe, and that the conversation was inappropriate. Everhart mocked Caron's professional background, referring to her extensive judicial experience as a "hobby" to undermine Carson's expertise and assert dominance in the discussion.

98. During the same meeting, Everhart referenced a prior conversation she had with Caudle, stating that they were on the "same page" about Carson and that Carson needed to align accordingly. This comment suggested a coordinated effort between Everhart and Caudle to impose a specific outcome on DEI matters, raising ethical concerns about how City leadership was leveraging legal counsel to enforce a particular agenda.

99. The meeting lasted approximately forty-five (45) minutes without intervention by any of the employees present. Due to the ongoing harassment and verbal abuse, Carson left the meeting in an emotional state of tears. Those in this meeting intended to embarrass and humiliate Carson, and they succeeded.

100. Carson wanted to do something to bring attention to the conduct of those in the meeting, but anyone identified in the Employee Handbook that she could go to for help was in the room during the January 10, 2025, meeting, and did nothing to help Carson.

101. After a Core Team meeting on January 15, 2025, Deputy City Manager, Thom Morton, (hereinafter "Morton", an African American) called Carson to discuss how the meeting went. Morton told Carson that she made valid points in the meeting, but her delivery may have made others uncomfortable, suggesting that she adopt a more engaging tone, similar to his style. Morton stated that being direct as a Black person in the South could be perceived negatively and alluded to the fact that it could be even more problematic as a Black woman. Carson expressed her discomfort with Morton's statements, which she found very inappropriate and offensive.

102. These descriptors reflect racialized stereotypes commonly imposed on African American women in professional settings. Similarly situated white department heads were not criticized or disciplined based upon subjective "tone" or "perception" complaints.

103.    Carson reported her concerns to Clayton Roberts and her supervisor, Vigue. However, no follow-up or resolution was provided, and Morton's behavior continued in subsequent meetings.

104.    On January 18, 2025, the City's HR Director Clayton Roberts went to Carson's office and stated he needed support. Roberts detailed that Vigue had shown up to the IT Governance meeting late and appeared to be under the influence, stating that Jerod Patterson, Director of Corporate Affairs, and other staff members expressed concerns to him as well.

105.    Roberts asked Carson what he should do and Carson reminded Roberts that he had a duty to report this to Caudle and let him handle it. Carson offered to escort Roberts to Caudle for support, but Roberts declined, stating that he would talk to Caudle by himself.

106.    At approximately 6:48 p.m. on January 18, 2025, Carson texted Roberts to ask how the conversation with Caudle went. Roberts responded that they would discuss it the following day, but Roberts never followed up with Carson.

107.    Upon information and belief, Roberts never reported his concerns to Caudle, as required.

108.    On or about January 27, 2025, multiple City employees, including Corporate Affairs Director Jerod Patterson, raised concerns about Vigue's erratic behavior and suspected intoxication during work hours.  Although those concerns were acknowledged by Clayton Roberts, Roberts failed to anything about it, choosing instead, together with other responsible City employees, to look the other way.

109.    On January 28, 2025, and February 25, 2025, Carson attended Community Relations Advisory Committee (hereinafter CRAC) meetings after-hours as the designated City staff member. Everhart was also present at the meetings in her role as legal counsel, and despite

Everhart not being Carson's supervisor, Everhart assumed an authoritative and indirect supervisory role during the meetings, issuing unsolicited instructions, directives and critiques regarding Carson's work that were outside of Everhart's scope, directly undermining Carson's professional autonomy and decision-making, and before the January 10th meeting, even harassed and bullied Carson. Everhart's controlling behavior in these after-hours meetings created an intimidating and hostile atmosphere, leaving Carson feeling pressured and isolated.

## PRETEXTUAL INVESTIGATION

110.     Despite Carson being notified by Vigue in December, 2024 that she had done a "great job embracing the city's core values", and "communicates well and holds herself and others accountable", on February 5, 2025, Carson was verbally notified by Adam Hall and Kim Sampson that she was the subject of a workplace investigation related to alleged complaints from unidentified individuals regarding Carson's performance and harassment of staff.   Of course, by February 5, 2025, Carson had received no negative feedback about her job performance from anyone

111.     When Carson asked what the nature of the allegations were, Hall and Sampson indicated that they did not know what they were, but that they came through the City Manager's office.

112.     Carson was informed that she would receive a written notification the next day, February 6, 2025, outlining the specifics of the investigation.

113.     February 6, 2025, came and went without Carson receiving the written notification she was promised. It was not until February 11, 2025, that Carson received written notification that an investigative process was already underway.

114. The HR investigators assigned to Carson's case included Adam Hall and Kim Sampson. Both Hall and Sampson had prior knowledge of Carson's concerns regarding lack of support from leadership and accountability issues within the organization and fear of retaliation. Additionally, Adam Hall witnessed Carson's mistreatment in the meeting led by Everhart on January 10, 2025, where Carson was subjected to prolonged belittlement and bullying. Hall even later expressed his concerns to Carson about the meeting's inappropriate setup and the evident racial and power dynamics. Upon information and belief, Sampson (who is white) had voiced a grievance previously against Carson, and that grievance was dismissed. Their direct involvement compromised the impartiality of any investigation, violating the City's written policies.

115. Upon information and belief, Hall and/or Sampson undertook to interview other employees of the City (who had not made any complaints about Carson) and Carson learned that other City employees were informed that an investigation was being conducted of her, and City employees that were interviewed were solicited to make complaints about Carson, signaling that any investigation was a complete fishing expedition.

116. Carson was treated noticeably differently from that point, leaving her feeling isolated and alone, and without access to a fully sober and functional supervisor in the form of Vigue, and was treated by her colleagues like she did not belong.

117. Carson hired counsel to assist her in what she viewed as a concerted effort to get rid of her. Carson's legal team reached out to Caudle and Everhart on February 21, 2025, to inquire about the investigation that Carson was the center of. In a response from Meredith Everhart on February 24, 2025, Everhart assured counsel that,

> "This investigation is…being carried out under Policy 206, Employee Discipline and Appeals. Section 7.0 of Policy 206 states that probationary employees like Ms. Carson may be discharged at any time during the probationary period, and the City is not required to follow the formal disciplinary process or provide any mechanism for the employee to

appeal. They may be discharged at any time in the discretion of the City. However, due to Ms. Carson's position in the organization as a department director, it was determined that more of a process was warranted and appropriate prior to taking any disciplinary action in this situation…"

118. On March 3, 2025, Carson submitted a formal grievance to address significant violations of the City of Wilmington policies by Tony Caudle (City Manager), Mary Vigue (Assistant City Manager), Clayton Roberts (HR Director), Adam Hall (HR: Talent and Development Manager), and Kim Sampson (HR: Assistant Director), stating that these individuals failed to uphold the City's stated core values and ethical and legal standards, leading to a hostile work environment, retaliation, discrimination, and severe breaches of workplace integrity.

119. By reason of this grievance, Carson had a meeting with appointed representatives of a Grievance Review Board, who heard from Carson and upon information and belief, prepared a report confirming some of her allegations, a report that Carson never received.

120. On March 7, 2025, Carson received a letter from Tony Caudle, informing her that her concerns were not grievable.

121. However, retaliation, harassment, biased investigations, and ethical violations are all grievable under the policies the City has adopted.

122. Caudle's March 7, 2025 letter to Carson was an attempt to silence her and prevent her from bringing to light what she uncovered about: the systematic racism within the City of Wilmington; the conflicted and biased investigation of Chief Williams; the gross misuse of public funds to investigate high ranking African American employees of the City; the substance abuse by Vigue, including during work hours and at work functions; the refusal by the responsible City Employees to take appropriate action; and the weaponization of HR processes.

**SHIPMAN WRIGHT & MOORE, L.L.P.**
575 Military Cutoff Road– Wilmington, N.C. 28405

123. On April 22, 2025, Carson and other City employees were notified via email by Caudle that Hall, the lead investigator in Carson's case, had resigned and his last day was April 17, 2025. The investigation into Carson was still pending at the time of Hall's resignation.

124. On May 6, 2025, Carson observed Vigue walk from her vehicle in the City parking garage into the entrance of the building at approximately 9:30 a.m. and Carson observed Vigue struggling to walk straight. Carson met with Vigue at approximately 10:30 a.m. and Vigue struggled to keep her eyes open and stay awake and repeatedly nodded off.

125. Any investigation undertaken of Carson was not conducted in accordance with the City's policies and procedures.

126. On May 8, 2025, Carson was terminated for alleged violations of workplace policies, based upon completely subjective assessments of Carson's communication style and demeanor.

127. Specifically, the City falsely alleged that Carson exhibited a "pattern of excessive tardiness, unprofessional communication, and dismissiveness toward colleagues and leadership", engaged in "harassing behaviors perceived by multiple colleagues as intimidating, insulting, and dismissive", was guilty of "interrupting and dominating conversations, effectively preventing others from speaking, publicly humiliating colleagues through inappropriate comments, and repeatedly disrupting staff work and overstepping professional boundaries."

128. Prior to May 8, 2025, Carson had never been informed about or had any notice of any of the unsubstantiated allegations set forth in her letter of termination and was never given any opportunity to respond.

129. In fact, approximately a month prior to the date in February, 2025 that Carson was informed that she was the subject of an "investigation", Vigue informed her that she had done "a

great job embracing the city's core values"; that she had "worked and reached out to departments across the organization"; that she had "been available to participate in special projects and teams"; and that she "communicates well and holds herself and others accountable."

130. In is indeed that later observation from Carson's white supervisor, Vigue (that Carson "holds…others accountable), that was a cause of her termination – that as the City's Director of DEI, those responsible white employees of the City knew that Carson would do her job, and hold others accountable who would not. Those same responsible white employees knew that Carson possessed information about the differential treatment of African American employees of the City, including those within the WPD, had provided false information to the public about what public monies had been expended upon, and to maintain the narrative that no culture of systemic racism towards, or a disparate impact upon, African American employees of the City existed, it became imperative that the responsible white City employees undertake action in an attempt to besmirch Carson and her reputation.

131. Similarly situated white employees of the City were not terminated for comparable conduct.

132. The stated reasons for Carson's termination were false and pretextual.

133. As a result of Carson's termination, her health insurance benefits were terminated. As a result, Carson could not access needed medications for her daughter, who while those medications were absent, attempted to harm herself.

134. On or about May 16, 2025, the City held a budget workshop, during which Caudle informed the City Council that the specialist position in the City's DEI division had been eliminated and that Carson's position was vacant.

135. A member of the City Council (later defeated in his efforts at re-election) stated that the line item in the City's budget for the DEI division was "some sort of behavioral training person for the City and I'm opposed to that" and suggested that the City's budget be modified to completely eliminated the DEI division and shift those monies to cover the cost of WPD's mounted horse unit.

136. Another member of City Council voiced concerns about the fact that he had not received any reports on the DEI division's accomplishments since its creation. Of course, both Caudle and Vigue were in possession of key department reports and policies that Carson had prepared, but that Caudle and Vigue had never approved during Carson's tenure. Furthermore, both Caudle and Vigue knew that Carson had been thwarted in her efforts to accomplish goals of the DEI division by the direct actions and inaction of the responsible white City employees, and that Carson had filed a grievance about that.

137. Instead of confronting the false allegations against Carson, and again, revealing the dysfunction that existed within the executive ranks of the City among the responsible white employees , Caudle instead stated that "we have reviewed the job description and are trying to retool it so it will be more focused on internal service delivery issues."

138. Caudle's statements were false- it was not Caudle who had been working on anything – it was Carson, and neither Caudle Vigue had anything to do to "retooling" the DEI division.

139. Caudle also further falsely stated that his team was "already working on the conversion before the federal and state governments began targeting DEI programs."  Caudle had nothing to do with it – it was Carson that had been working with other department heads, "on the

conversion", and it was Caudle that had made a conscious decision not to do anything the information that Carson provided to Caudle for his approval.

## FIRST CLAIM FOR RELIEF
### (Title VII – Race Discrimination – Disparate Treatment)

140.  Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 139 as if fully set forth herein.

141.  Carson is a member of a protected class.

142.  Carson was qualified for her position and performed each and every obligation of her job in accordance with the requirements of her position.

143.  Carson suffered adverse employment action – termination.

144.  Similarly situated white employees were treated more favorably than Carson and other African American City employees and were not subjected to stereotypes involving their personalities and leadership styles.

145.  African American officers within the WPD were subjected to heightened scrutiny and disciplinary exposure, and Carson raised concerns that these practices, coupled with the biased investigation of Chief Williams, the investigation of another high-ranking African American employees, and the investigation of Carson reflected systemic bias against African Americans.

146.  No corrective action was taken.

147.  Carson's race was a motivating factor in the City's actions to terminate her employment.

148.  The City's actions in terminating Carson's employment violated Title VII.

149.  As a direct and proximate cause of the City's actions in terminating Carson's employment, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover

damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## SECOND CLAIM FOR RELIEF
### (Title VII – Hostile Work Environment)

150.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 149 as if fully set forth herein.

151.    Carson was subjected to race-based comments and stereotyping.

152.    This conduct was not isolated, and was unwelcome, severe, pervasive and objectively hostile.

153.    The City and the responsible City employees were aware of the hostile work environment to which Carson was subjected and failed to take corrective action.

154.    The City's actions in creating and condoning a hostile work environment violated Title VII.

155.    As a direct and proximate cause of the City's actions and the hostile work environment to which Carson was subjected, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## THIRD CLAIM FOR RELIEF
### (Title VII – Retaliation)

156.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.    Carson engaged in protected activity by opposing race discrimination and advocating for equitable treatment of African American employees of the City.

**SHIPMAN WRIGHT & MOORE, L.L.P.**
575 Military Cutoff Road– Wilmington, N.C. 28405

158. The City, instead of taking action to eliminate racial discrimination, subjected Carson to a biased investigation that was not conducted in accordance with any of the City's applicable policies and procedures and terminated shortly thereafter.

159. A casual connection exists between Carson's protected activities and the adverse employment actions taken against her.

160. The investigation of Carson ensued after she engaged in protected activities, and made known her knowledge of the targeted investigations (and associated waste of taxpayer money) of African American leaders, her knowledge of the impairment issues of her white supervisor, and her knowledge of the disparate treatment of African American officers in WPD.

161. The actions of the City violated Title VII's anti-retaliation provisions.

162. As a direct and proximate cause of the City's actions and acts of retaliation against her, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## FOURTH CLAIM FOR RELIEF
### (Title VII – Disparate Impact)

163. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 162 as if fully set forth herein.

164. The City maintained facially neutral policies and practices, including: (a) subjective disciplinary standards; (b) discretionary investigatory procedures; and (c) "probationary" employment periods.

165. These policies disproportionately impact African Americans, including African American employees of the City, including those within leadership positions or who aspire to be in those positions.

**SHIPMAN WRIGHT & MOORE, L.L.P.**
575 Military Cutoff Road– Wilmington, N.C. 28405

166. The City's facially neutral policies have a significant, adverse and disproportionate impact on a protected group, African Americans.

167. The City's policies are not job-related or consistent with business necessity, or less discriminatory alternatives exist.

168. African American employees of the City are underrepresented in top-paying and leadership roles when comparing the workforce for the City to the broader community demographics in Wilmington.

169. The specific practices being challenged in this case, that upon information and belief have contributed to or caused a disproportionate impact, include the lack of diversity in the workplace of the City (especially in positions of leadership); the differential treatment of African-American employees of the City, especially those in positions of leadership; the attempts to silence Carson from revealing what she knew about systemic racism within the ranks of City employees, including those within the WPD; the pretextual investigations (at least two (2) of which at great taxpayer expense) of African American employees of the City within positions of leadership; the failure to follow the City's own policies and procedures in undertaking investigations of African American employees; the efforts to distance the City from any continued commitment to its "Rise Together" initiatives adopted (but not rescinded) by the City Council; the practice of retaining white employees of the City in positions of leadership who were obviously not doing their job (or were too impaired to do so). ; and there exists a causal connection between the City's challenged policies and the disparate impact upon African Americans.

170. The City's practices have a disproportionately adverse effect on African Americans and are otherwise unjustified by a legitimate rationale.

**SHIPMAN WRIGHT & MOORE, L.L.P.**
575 Military Cutoff Road– Wilmington, N.C. 28405

171. A study undertaken in 2020 highlighted that African American employees are underrepresented in top-paying and leadership roles in local government in Wilmington generally, and the City specifically. Upon information and belief, as of 2025, that statistic had not changed within City employment.

172. The City has a pattern of investigations that have targeted high-ranking African American employees, including Carson.

173. The City's policies, and no other factors, are a direct cause of the significant disparate impact to African Americans, including Carson.

174. As a direct and proximate cause of the City's actions and disparate impact of its policies, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## FIFTH CLAIM FOR RELIEF
### (Equal Protection – 42 U.S.C. §1983)

175. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 174 as if fully set forth herein.

176. The Equal Protection Clause of the United States Constitution prohibits intentional race discrimination by state actors.

177. The City is a state actor, acting under color of law.

178. The City intentionally treated Carson differently from similarly situated white employees and discriminated against her because of her race. The unequal treatment of Carson was the result of intentional or purposeful discrimination, and the disparity was not justified under any appropriate level of scrutiny.

179. The City has engaged in a policy and custom of treating African American employees of the City, including Carson, differently than non-African American employees of the City, and the final policymakers of the City have ratified those policies and customs.

180. Carson was subjected to selective enforcement of disciplinary policies, and the City's actions were motivated, at least in part, by Carson's race.

181. Upon information and belief, Caudle and/or Vigue, who are white, were the final policymakers as it pertained to Carson's employment.

182. The decision to terminate Carson was approved and/or directed by Caudle and/or Vigue.

183. The investigations of Carson and other high-ranking African American employees of the City reflect a custom of discretionary enforcement.

184. These constitutional violations were caused by official City policies, customs and ratification by final policymakers of the City.

185. The City's actions are violative of 42 U.S.C. §1983.

186. As a direct and proximate cause of the City's actions, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## SIXTH CLAIM FOR RELIEF
**(Violation of the North Carolina Constitution – Article I, Secs. 1 and 19)**

187. The Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 186 as if fully set forth herein.

188. Article I, Section 1 of the North Carolina Constitution guarantees that all persons are endowed with inalienable rights, including the enjoyment of the fruits of their labor.

189. Article I, Section 19 of the North Carolina Constitution provides that no person shall be denied the equal protection of the laws.

190. These provisions prohibit state actors, like the City and its officials, from engaging in intentional race discrimination and arbitrary deprivation of employment rights.

191. At all times material to this action, the City and the responsible City employees were acting under color of state law.

192. The City intentionally discriminated against Carson on the basis of her race in the terms, conditions, and termination of her employment.

193. The City selectively enforced investigatory and disciplinary procedures against Carson because she is African American.

194. The City relied upon racially stereotyped characterizations of Carson's communication style and demeanor in order to justify her termination.

195. The actions of the City denied Carson equal protection of the laws in violation of Article I, Section 19 of the North Carolina Constitution.

196. The actions of the City further deprived Carson of the fruits of her labor in violation of Article I, Section 1 of the North Carolina Constitution.

197. The conduct of the City was arbitrary, capricious, discriminatory, and undertaken with deliberate indifference to the constitutional rights of Carson.

198. There are no statutory remedies available to Carson, or such remedies are inadequate to address the actions of the City and to afford complete relief to Carson for the constitutional violations described herein.

199. As a direct and proximate cause of the City's actions, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational

harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## SEVENTH CLAIM FOR RELIEF
### (Wrongful Discharge)

200. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 199 as if fully set forth herein.

201. North Carolina law recognizes a claim for wrongful discharge when an employee is terminated for reasons that violate clearly established public policy.

202. The public policy of North Carolina is express in, among other sources, the North Carolina Constitution, North Carolina's Equal Employment Practices Act (declaring the State's public policy against discrimination on the basis of race) and North Carolina's strong public policy prohibiting retaliation against employees, like Carson, who oppose unlawful discrimination.

203. Carson was terminated because she: (a) was African American; (b) opposed racially discriminatory practices within the City; (c) reported disparate treatment of African American employees and officials; (d) raised concerns over racially biased investigatory and disciplinary practices; (e) uncovered the gross waste of taxpayer dollars; and (f) refused to participate in or endorse conduct that she reasonably believed to be discriminatory and unlawful.

204. Terminating an employee for opposing race discrimination and advocating compliance with anti-discrimination laws, reporting disparate treatment, exposing the gross waste of taxpayer dollars and refusing to participate in the City's unlawful conduct was wrongful and in violation of the public policy of North Carolina.

205. Carson's protected conduct was a substantial factor in the decision to terminate her employment.

206.    As a direct and proximate cause of the City's actions, Carson has suffered damages, including lost wages and benefits; front pay and future losses; emotional distress, and reputational harm, for which she is entitled to have and recover damages against the City in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

**WHEREFORE,** the Plaintiff prays the Court as follows:

1.    That the Plaintiff have and recover damages against the Defendant, in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

2.    That the costs of this action, including the Plaintiff's reasonable attorneys' fees, be taxed by the Court against the Defendant.

3.    For trial by jury on all issues so triable; and

4.    For such other and further relief as to the Court seems just and proper.

Respectfully submitted, this the 26th day of February 2026.

SHIPMAN WRIGHT & MOORE, L.L.P.
*Attorneys for Plaintiff*

By:  **/s/** *Gary K. Shipman*

**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
gshipman@shipmanlaw.com
**JAMES T. MOORE**
N.C. State Bar No.: 57308
jmoore@shipmanlaw.com
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Tel: (910) 762-1990
Fax: (910) 762-6752